## WINANS v. LANDSTROM FURNITURE CORPORATION.

No. 8053.

Circuit Court of Appeals, Seventh Circuit.

Dec. 30, 1942.

Robert V. Jones, of Chicago, Ill., for appellant.

Henry J. Brandt, of Chicago, Ill., Karl C. Williams, of Rockford, Ill., A. L. Rittenberg, of Chicago Ill., and Charles Katz, of Los Angeles, Cal. (Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., of counsel), for appellee.

Before SPARKS, MAJOR and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

Plaintiffs appeal from a judgment in favor of the defendant in their suit for damages for alleged breach of a written contract set forth in the bill of complaint. The case was referred to a master to ascertain whether plaintiffs were entitled to any damages, and if so, the amount thereof. The master reported no liability; the court adopted his findings of fact, confirmed his conclusions of law, and dismissed the complaint, assessing costs against the plaintiffs.

To support their complaint, appellants rely on the following letter dated September 14, 1936, directed to appellants and signed by appellee by its president, C. S. McIntyre:

"Confirming our conversation this morning with reference to a cabinet—sample of which we have just built for you:

"We understand that you gentlemen have developed this cabinet and have spent several weeks in arranging for the designing and sale of the cabinet to the J. B. Seeburg Corporation. It is understood that you are paying all the designing cost in connection with the cabinet and that we are, in no way, responsible to any other parties for any commission whatever in connection with the sale and manufacture of this cabinet.

"We are about to quote the Seeburg Corporation at a price established by you. This price will be f. o. b. Rockford, freight allowed by truck, uncrated, to the Seeburg plant in Chicago.

"The trucking charge in connection with delivery of these cabinets is at $1 per cabinet. If you are able to arrange for trucking service at a less cost that is satisfactory to the Seeburg Corporation, we are perfectly willing to abide by this arrangement and will give you the benefit of the difference in cost.

"We are pleased to give you for three years from date, protection on Seeburg business placed with Landstrom Furniture Corporation and any negotiations for business between Landstrom Furniture Corp. and Seeburg Corp. is to be handled through you.

"It is understood that your commission, or the difference between price quoted to you and the billing price to Seeburg will be paid to you immediately upon receipt of payment of our invoices by Seeburg. We will be glad to send you duplicate invoices rendered to Seeburg Corp."

This alleged contract was the culmination of business relations which were started between the parties early in 1936, when appellants were looking for a cabinet maker in a position to produce in sufficient quantities a cabinet which was being designed under their direction to carry out an idea originated by Winans for a coin-operated phonograph (commonly known as a juke box) which would utilize indirect lighting and glass balls in a modernistic design. Winans had a social contact with one Johnson, vice-president and general sales manager of the Seeburg Corporation which manufactured coin-operated phonographs, and appellants hoped through this contact to sell large quantities of the cabinets to the corporation, obtaining their profits from the business from a commission to be arranged for with the manufacturer of the cabinets. In April, 1936, while they were still working on the details of their design, Morgan got in touch with William Blacklock, a representative of appellee, to inquire whether it would be interested in manufacturing the cabinets provided appellants were able to obtain the orders they anticipated. Blacklock was at that time acting as manager of appellee, having become associated with that company to represent bondholders under a reorganization plan when it became involved in financial difficulties. He was very anxious to obtain the business for appellee, and met Morgan frequently during the following months to discuss various details. Blacklock testified that appellee's engineering department had charge of negotiations relating to various changes in the details of the cabinet, after completion of the sample, but that their sales department had no connection with Seeburg, leaving all that to appellants.

After the sample was definitely accepted, appellee notified Morgan by letter of September 11, 1936, of the unit price for which appellee would deliver the cabinets to Seeburg, stating further that it was understood that he was to add his commission and make a quotation to Seeburg, and that the price appellee was quoting did not admit of any commission or designing expense. Thereafter appellants told appellee the price to bill Seeburg, and as to that Blacklock testified that he understood that appellants had discussed it with Seeburg and that it was acceptable to the latter. The price quoted included an additional amount or "overage" to be remitted to appellants as their commission for their services. Morgan testified that Blacklock advised this form of commission for the reason that they (appellants) "had to pay Roberts for the working drawings and * * * Henkel for his connection in some designs." The overage amounted to $3.60 per cabinet for the first thousand and $3 for all the rest, aggregating approximately $4600.

After all these negotiations, by letter and in person, between appellants, appellee and Seeburg, according to the testimony of Morgan, he and Winans met Blacklock and McIntyre, appellee's president, on September 14, for the purpose of discussing a sales agreement. After full discussion of the terms, participated in by all, McIntyre dictated the letter set forth in the complaint and quoted above, with suggestions from each of the other three. It will be noted that all preliminary discussions, as well as the first four paragraphs of the letter-contract, referred to a particular cabinet, the sample of which had been built by appellee for submission to Seeburg. This model was known as the Melody King or Model K, and all the arrangements were made between the three parties with particular reference to it. However, the fifth paragraph referred more generally to "Seeburg business," and provided that "any negotiations for business between * * * (appellee) and Seeburg Corporation is to be handled through you." Herein lies the crux of the controversy. Was the "Seeburg business" limited to that involving the Melody King as to which all preliminary negotiations were had, as contended by appellee and found by the Special Master, or did it cover all business of appellee with Seeburg for a period of three years, as contended by appellants?

The significance of this lies in the fact that, although appellee continued to manufacture Melody King cabinets until about November, 1937, paying the agreed overage on all such cabinets, when a new cabinet was designed by an employee of Seeburg, without any participation by appellants in such new design, Seeburg

placed orders directly with appellee for the manufacture of the new cabinets instead of letting appellants conduct negotiations for it, and appellee executed those orders without reference to appellants. Appellants contend that this constituted a breach of contract, and that they are entitled to recover damages at the rate of $3 for every cabinet made by appellee for Seeburg for the three-year period covered by the contract.

The master found that the letter of September 14 constituted an offer on the part of appellee which was accepted by appellants by their obtaining orders for the certain cabinet known as the Melody King or Model K, from the Seeburg Corporation, to be manufactured by appellee, and that all negotiations between the parties dealt wholly and exclusively with that particular cabinet. He further found that appellants did not negotiate for the sale of any other cabinet; that no other cabinets sold by appellee were designed by appellants; and that later cabinets made by appellee for Seeburg were of an entirely different design. He further found that appellee did nothing to cause Seeburg to cease buying the Melody King cabinets, but that they were discontinued because they were unsatisfactory. He therefore concluded that appellants were not entitled to recover damages and no accounting was due them. The court adopted the findings of fact and conclusions of the master and entered judgment accordingly, dismissing the complaint.

■ We are convinced that whether the parties to the contract intended it to cover all business between appellee and Seeburg or only that business relating to the sale of the Melody King, its consummation depended on the action of an outsider, not a party to the contract, and appellants' part in the contract lay in their obtaining business for appellee from that outsider. The continuation of that business, once the original model that gave rise to the agreement in the first place was outmoded, depended on obtaining orders for later models. Even if appellants' contention is correct, that the contract referred to all business between Seeburg and appellee for a period of three years, as may plausibly be argued from appellee's agreement that "any negotiations between Landstrom and Seeburg is to be handled through you," the fact remains that unless appellants were in a position to carry on negotiations which would bring in orders from Seeburg, the contract would be inoperative.

Appellants contend, as to this, that appellee was responsible for the cessation of their negotiations, in that appellee began dealing directly with Seeburg instead of leaving negotiations to be conducted by them. They ignore certain significant factors which prevented the carrying on of negotiations by them. The first was a change of personnel in the sales department of Seeburg. It will be remembered that it was a social contact between Johnson and Winans that encouraged the latter to have developed what was apparently rather a nebulous idea for a new design in coin-operated phonographs. There is nothing of record to indicate that either Winans or Morgan had any designing abilities or training, and it is clear that they employed others to put Winans' idea into practical form. Among the others were one Henkel, whom they paid outright ($500) for his services, and Roberts, to whom they finally agreed to assign one-third of their overage. This Roberts was an industrial designer who had had his own business for some time. In March, 1937, Johnson left the employ of Seeburg, and his place was taken by Roberts. He seems to have started work on new designs at once, and according to his testimony, when Morgan asked him if there were any chance for him to figure on supplying any of the new designs, Roberts gave him to understand that there would be no opportunity for anyone else to sell the company any designs because that was his job.

In view of the fact that the business had developed in the first place from the sale of a new design, it seems clear that unless appellants continued to have new designs to offer they could not expect to do business with the company, or obtain business for appellee. We are of the opinion that the contract imposed no obligation on appellee to refuse to do business directly with Seeburg if appellants had no basis for conducting any negotiations on their behalf. Hence the significance of the change in personnel. In place of a friend, Johnson, glad to co-operate with them in selling something to the company, they came up against a professional designer, capable of developing his own designs for the company, thus doing away with any need the company may have had

to deal with manufacturers through the medium of a sales agent. This apparently was recognized by Morgan who testified that he told both Winans and Blacklock in the summer of 1937 that they were not going to get any further orders from Seeburg.

A further factor preventing continuation of the contract as related to new cabinets was the fact that during a year and a half of the contract period, Morgan himself was in the employ of Seeburg, and not, apparently, in a position to conduct negotiations for appellee, even if he had had any design about which to negotiate. Winans was out of the city for most of the period and also does not appear to have been in a position to conduct any negotiations. Hence, we are convinced that circumstances beyond the control of appellee rendered the contract impossible of performance with respect to models adopted by Seeburg subsequent to the Melody King, even if that contract was intended to cover such subsequent models, as appellants contend. We think appellee was not obliged to refuse to accept further orders from Seeburg because they did not come through appellants. In effect, appellants' contention means that because they were responsible for bringing appellee and Seeburg together in the first place, appellee in quoting prices to Seeburg in competitive bidding, should have added the overage established with respect to the original Melody King model to every cabinet sold during the three-year period. We cannot agree with this contention.

Judgment affirmed.