**BELTRONICS, INC., Plaintiff-Appellant,**

v.

**EBERLINE INSTRUMENT CORPORA-
TION et al., Defendants-Appellees.**

**No. 74–1044.**

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 9, 1974.

Decided Dec. 4, 1974.

Rehearing Denied Dec. 31, 1974.

Certiorari Denied June 2, 1975.
See 95 S.Ct. 2399.

Dwight A. Hamilton and John T. Willson, Denver, Colo.. (Fuller & Evans on the brief, Denver, Colo.), for plaintiff-appellant.

Robert C. Poole, Albuquerque, N. M. (Marshall G. Martin, Robert W. Harris, and Poole, Tinnin, Danfelser & Martin, Albuquerque, N. M., on the brief), for defendants-appellees Eberline Instrument Corp. and Capco, Inc.

Stuart S. Gunckel, Denver, Colo. (Rovira, DeMuth & Eiberger and Akolt, Dick & Akolt, Denver, Colo., on the brief), for defendant-appellee Western Electric Co., Inc.

Before BREITENSTEIN, HILL and McWILLIAMS, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This suit was brought in Colorado state court as a contract case and was removed to federal court on diversity grounds. After removal, Western Electric Company, Inc., was added as a defendant and the complaint was amended to charge antitrust violations. The district court held for defendants and plaintiff Beltronics, Inc., has appealed. We affirm.

Beltronics, Inc., is a Colorado corporation and is the successor to Midwec Sales Co. W. Arthur Peterson and James E. King are officers of Beltronics and were officers of Midwec Sales.

Eberline Instrument Corp., defendant-appellee, is a New Mexico corporation,

and has a wholly owned subsidiary, Capco, Inc., a Texas corporation, which is also a defendant-appellee.

Western Electric Company, Inc., a New York corporation and defendant-appellee, is a wholly owned subsidiary of American Telephone and Telegraph Company (AT&T) which as the Bell Telephone System has 23 operating companies. The Bell System provides over 80% of the telephone service in the United States.

The products involved in the transactions among the parties will be referred to as capacitors.

In 1960 Midwec Sales, controlled by Peterson and King, became the exclusive representative of a Nebraska manufacturer in the sale of capacitors. Midwec Sales sold capacitors to Bell System operating companies until 1967. In 1961 Western gave notice that the magnitude of capacitor sales to Bell System operating companies required development of specifications for capacitors and a supply contract with Western. Specifications were prepared and a supply contract executed. In 1966 Western determined that a second supplier of capacitors was needed to avoid overdependence on one source. The contract between the Nebraska manufacturer and Midwec Sales was terminated. in 1967. King proposed to Eberline that it manufacture capacitors and become the second supply source for Western. Eberline acquired Capco, to make the capacitors, and all the stock of Midwec Sales, the name of which was changed to Beltronics. Beltronics was made the marketing agent for capacitors produced by Capco. Peterson and King were the principal officers of Beltronics. The contract with Eberline was the only substantial asset of Beltronics.

In January 1969 Eberline sold its Beltronics stock to Peterson and King and made a 5-year renewable contract with Beltronics by which Beltronics became Eberline's exclusive sales agent for the sale of capacitors to the telephone industry. Beltronics' commission on those sales was 15%.

The Western-Eberline contract was due to expire April 30, 1969. Beltronics submitted a, new price quotation for a 1-year renewal contract. In April, 1969, Western told Beltronics that the Eberline supply contract would not be renewed. The decision resulted from King's conduct violating Western policies.

At a New York meeting on April 14 Western made clear that it would do no further business with King, Beltronics, or any one associated with them. Eberline terminated its contract with Beltronics and later secured a new supply contract from Western Electric.

Beltronics then sued for breach of contract, tortious interference with contract relations, and antitrust violations by Western, Eberline, and Capco. After a two-week trial the district court made comprehensive findings of fact and conclusions of law. Some of the issues resolved are not pertinent to this appeal.

I

The January 2, 1969, "Exclusive Sales Representative Agreement" made by Eberline and Capco with Beltronics was for five years and was renewable at the option of Beltronics for another five years. Paragraph 15 provided for termination at the option of Eberline under conditions which relate to sales performance by Beltronics and production capacity of Eberline. Eberline claims no right to terminate under this provision. The controversy concerns the following portion of paragraph 16(a):

"In addition to the option to terminate this Agreement under certain conditions as provided in paragraph 15, Eberline may terminate this Agreemnt at any time by giving Beltronics notice in writing of termination at least ninety (90) days prior to the termination date and by paying Beltronics the sum of $75,000.00, * * ."

Eberline did not give 90 days' notice and did not pay the $75,000.

■ We reject Beltronics' attack on the findings of the trial court. They

have record support and are not clearly erroneous. The court found that Western's refusal to renew the capacitor supply contract was caused by King's violation of Western's entertainment and gift policies, and his improper acquisition and use of a Western publication intended for internal information. The Western decision was made unilaterally without participation by Eberline or Capco.

The question is whether the termination by Eberline and Capco without notice or payment to Beltronics was an actionable breach. The trial court found: (1) The contract was made on the assumption that the Western market for capacitors would continue. (2) The refusal of Western to deal with Beltronics made performance impossible. (3) The contract was subject to the implied condition that if without fault of the parties the Western market became unavailable, "the Agreement would be dissolved and the parties excused from performing it." (4) The Western market was foreclosed by the unilateral action of Western "without fault on the part of Eberline and Capco." (5) The implied condition of the contract caused it "to be dissolved, and excused the parties from further performance." Accordingly, the court held that termination by Eberline and Capco was not an actionable breach.

■ We reject Beltronics' argument that the situation is covered by contract ¶ 15. That provision contemplated sales activities by Beltronics. That activity was ended by the unilateral action of Western. Paragraph 16(a) is in effect a buy-out clause. When Western refused to do business with Beltronics, nothing remained for Eberline to buy.

■ The unilateral decision of Western not to do business with Beltronics destroyed all possibility of performance. It makes no difference whether the issue be labeled "impossibility," "failure of consideration," or "commercial frustration" because the crucial inquiry is whether the equities of the case place the risk on Beltronics or Eberline. *Lloyd v. Murphy*, 25 Cal.2d 48, 153 P.2d 47, 50. We have a supervening event caused by the conduct of Beltronics without any contributory fault on the part of Eberline. See 6 Corbin, Contracts, § 1354, pp. 458–459, and Restatement, Contracts § 457, p. 849. The inability of Beltronics to make sales to Western made the contract inoperative. See *Winans v. Landstrom Furniture Corporation*, 7 Cir., 132 F.2d 457, 459.

The arguments of Beltronics that the $75,000 payment was for services rendered and to reimburse for the purchase by King and Peterson of the Beltronics stock are without record support.

■ The Western-Eberline contract required Eberline to make the capacitors in accordance with Western's specifications, to incorporate only cable sold to it by Western, and to use that cable for no other purpose. Beltronics argues that to relieve Eberline from performance sanctions a restraint of trade, and that the defense of impossibility is unavailable because Eberline agreed to restrictive provisions which made Beltronics' performance impossible. Beltronics negotiated the agreement which contained the restrictions. The evidence does not support the claim that, absent the restrictions, Beltronics could have sold to other Bell System companies. Beltronics' loss was not caused by the restrictions but by its own conduct which resulted in Western's decision to stop business relations.

## II

■■ Beltronics asserts that Western tortiously interfered with the Beltronics-Eberline contract and intentionally induced a breach thereof. We have held that no breach occurred. The issue then is whether Western wrongfully interfered with the contract relationship. We take the findings of the trial court to be that whatever interference occurred was justified. Beltronics does not deny the actions of King which caused the

Western decision. Indeed, Beltronics concedes that Western had the right to end its dealing with Beltronics. It argues that King's actions bore upon the Western-Beltronics, not the Eberline-Beltronics, relationship. This does not follow because Western could legitimately refuse to purchase, either directly or indirectly, from or through Beltronics. Determination of "unwarranted interference" depends on the facts of each case, Watson v. Settlemeyer, 150 Colo. 326, 372 P.2d 453, 456, and is a question for the fact finder. See Order of Railway Conductors v. Jones, 78 Colo. 80, 239 P. 882, 883. The record sustains the trial court and we agree that Western was guilty of no tortious interference.

### III

We turn to the antitrust claims. Beltronics argues that the restrictions in the Western-Eberline contract on the purchase of cable and the sale of capacitors made with that cable constitute a per se violation of § 1 of the Sherman Act, 15 U.S.C. § 1, within the holding in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed. 2d 1249. Schwinn was concerned with a contract between a producer and a distributor in which the producer imposed restrictions on resales by the distributors and retailers. We are not concerned with a vertical relationship such as that in Schwinn. The Court there was concerned with the anticompetitive effects of a manufacturer's restrictions downstream in the channels of distribution.

We are concerned with an agreement for the sale by Western to Eberline of cable and the sale of capacitors by Eberline to Western. In Schwinn the manufacturer parted with dominion, and the restrictions on sale affected transactions by distributors and retailers. In our case we have no impediment to competition. Eberline purchased cable from Western, used the cable in making capacitors, and sold the capacitors to Western. In effect Western bought the cable back, albeit in a different form. Schwinn has no application. The record discloses no restraint of trade in violation of the Sherman Act. In any event we find nothing in the record to show that Beltronics was, or could have been, damaged by the restrictions.

### IV

Beltronics also argues that a per se Sherman Act violation is established because it was the victim of a group boycott by Western and Eberline. Reliance is placed on Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741. Broadway-Hale, a powerful competitor of Klor's, instigated a wide combination of manufacturers and distributors to sell not at all, or on highly disadvantageous terms, to price-cutting Klor's.

Klor's is not pertinent, and we find no evidence of any group boycott here. There is no combination, either horizontal or vertical, to exclude competitors or influence the trade practices of a boycott victim. See Worthen Bank & Trust Co. v. National BankAmericard, Inc., 8 Cir., 485 F.2d 119, 124, cert. denied 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473. Instead of the elimination of a competitor at some level, we have the elimination of a non-competing middleman. See Bushie v. Stenocord Corp., 9 Cir., 460 F.2d 116.

There is no unreasonable restraint of trade here. Western was free to buy capacitors from anyone. Its selection of Eberline cannot be stretched into a claim of a § 1 violation. Beltronics' admitted violation of Western policies caused the Western decision to end the relationship. There is no intimation of any connivance with Eberline or anyone else.

Affirmed.