**SIMS CONSOLIDATED, LTD.,**
**Plaintiff-Appellee,**

**v.**

**IRRIGATION AND POWER EQUIPMENT, INC., a Colorado Corporation, et al., Defendants-Appellants.**

No. 74-1732.

United States Court of Appeals,
Tenth Circuit.

Argued May 20, 1975.

Decided June 24, 1975.

Rehearing Denied July 17, 1975.

Certiorari Denied Oct. 20, 1975.
See 96 S.Ct. 218.

---

Francis C. Browne, Washington, D. C. (of counsel, Edward T. Colbert, Washington, D. C. and W. David Pantle, Denver, Colo.), for appellee.

John R. Trigg, Denver, Colo., and James N. Johnson, A. O. Smith Corporation, Milwaukee, Wis., for appellants.

Before HILL, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Defendants below appeal from an adverse declaratory judgment order which upheld the validity of a contract and assessed royalty damages of $95,100.76. A summary of the pertinent facts will facilitate our review.

Plaintiff Sims Consolidated, Ltd. (Sims) is an Australian corporation based in Sydney, Australia. In 1970, via a merger, Sims became successor in inter-

est to Consolidated Metal Products (CMP), an Australian corporation. Prior to its merger with Sims, CMP had purchased another Australian corporation, Grasslands Pty., Ltd. (Grasslands). After the merger Grasslands became a wholly owned subsidiary of Sims.

Defendant Layne and Bowler Pump Company (L & B) is a deep well turbine pump company which was acquired by defendant A. O. Smith Corporation (Smith) in 1969 pursuant to a stock buyout. In 1971, defendant Irrigation and Power Equipment, Inc. (I & P) purchased assets of L & B relating to the manufacture of L & B's irrigation system.

In 1960, R. S. Charles (Charles), President of L & B, visited Australia in an effort to extend L & B's business in foreign lands. As a result of this trip, L & B associated with Grasslands in their pump business. (At this time J. H. Broinowski, Managing Director of CMP, related to Charles that the letter of intent for the joint venture was subject to approval by the CMP board of directors). Although Charles observed portions of Grasslands' center pivot irrigation system during his visit, the joint venture related only to the manufacture and sale of pumps.

A year later, in 1961, L & B was contacted by one of its pump dealers who had become a dealer for a center pivot irrigation system. This system, however, was having operational problems and Charles contacted CMP for sales literature and other information which explained how Grasslands' "Rainline" center pivot system worked. Thereafter, L & B became a Grasslands dealer and ordered ten (10) "Rainline" units. At this time Charles told Grasslands that if it was more economical to manufacture their system in the United States, L & B would pay a royalty.

The first "Rainline" units imported by L & B did not work in the United States because the topography and soil composition within the States differed substantially from that of Australia. Also, a patent infringement suit against L & B

by an American irrigation system manufacturer required that an electrical power drive be substituted for the hydraulic drive of the original "Rainline". Notwithstanding these problems, by 1966 L & B was marketing its own center pivot irrigation system under the name of "Raincat".

During L & B's patent infringement suit and again in 1963, CMP pressed Charles for a written royalty agreement. This contract, which is the basis of this action, was finally consummated on May 1, 1967 in Los Angeles, California. At that time two copies of the contract were executed with Broinowski signing on behalf of CMP and Charles and Bower (L & B's President) signing on behalf of L & B. Broinowski's copy was forwarded to Sydney for authentication by the CMP Board on May 16, 1967.

Under the contract L & B was to pay a 2½% royalty to CMP on its "Raincat" sales in excess of its first $1,920,000 sales. In return, L & B was afforded: (1) the right to use all "improvements, developments and patented features and designs developed—by CMP in connection with 'Rainline' equipment"; (2) an exclusive franchise for the manufacturing and sale of "Rainline" in the United States and Canada; and (3) the mutual exchange of research with CMP. The contract further provided that if CMP utilized any "Raincat" features in the development of its "Rainline", it would pay a 2½% royalty to L & B.

In 1968 Charles sought relief from the contract which was denied by CMP. When Smith purchased control of L & B in 1969, Charles was requested to again confer with CMP relative to relief from the contract. Relief was denied.

In 1969 the exempted sales of $1,920,000 were reached. Thereafter, until June 30, 1970, L & B paid CMP royalties of $64,147.04. On October 28, 1970, general counsel for Smith, writing on behalf of L & B, notified CMP that L & B was rescinding and terminating the contract. Subsequent thereto, L & B sold its irrigation assets to I & P on October 12, 1971. Under the terms of the sale, L &

B agreed to indemnify I & P against any liability on the May 1, 1967 contract with CMP. In 1972 Smith sold L & B to General Signal Corporation under a contract whereby Smith agreed to indemnify L & B against any liability arising from the May 1, 1967 contract with CMP.

Upon the repudiation of the contract, Sims filed suit on December 20, 1971, seeking: (1) declaratory judgment of enforceability of the contract; (2) an accounting for royalties; and (3) injunction for business tort.[1] After considerable pre-trial "sparring", trial on the issue of liability was set for May 22, 1973. On May 17, 1973, counsel were notified that trial was being continued because no judge was available. At this time one witness had arrived from Australia, one was en route from Australia, and a third witness was about to depart from Australia.

Therefore, on May 17, 1973, counsel met informally with the Chief Judge and decided that the only alternatives to a continuance would be the appointment of a Master or the taking of all testimony via depositions. At this time, the parties, with the approval of the Chief Judge, agreed to present their evidence via videotaped depositions augmented by written transcripts of the depositions. The record clearly indicates that although both counsel were displeased and reluctant to proceed by depositions, both agreed to do so, and no formal objections were made or raised as to this procedure. Trial depositions were thereafter videotaped on May 21, through May 23, 1973.

On October 31, 1973, the Trial Court, after reviewing all the depositions, transcripts, evidence, and briefs, and after hearing oral arguments on the issue of liability, entered a Memorandum Opinion and Order upholding the contract and requiring an accounting of royalties due to date. Final judgment was entered for Sims on July 31, 1974.

In upholding the contract the Trial Court held that: (1) the contract was finalized in California and that the obligations of the parties were fixed as of that time; (2) the contract was valid under the laws of California; (3) the contract could be unilaterally terminated only after May 1, 1982; and that (4) Smith was liable to CMP for the royalty payments due from L & B under the contract.

On appeal appellants contend, inter alia, that: (1) compelling trial by deposition was error; (2) there was no contract because of lack of consideration; and that (3) Australian law controls and renders the contract void.

## I.

Appellants contend that the Trial Court erred by compelling trial by deposition. Appellants contend that: docket conditions, not the parties compelled the trial by deposition; the videotape trial was undisciplined; the record is defective and prejudicial to the parties; videotaping of trial testimony should be undertaken only with proper safeguards; they did not waive the right to appeal the use of the depositions; and that the Trial Court's failure to consider all the evidence resulted in numerous erroneous findings of fact.

Appellants contend that they were compelled to trial by deposition and that such a trial should be undertaken only with proper safeguards. They contend that the subject trial was undisciplined. We cannot agree.

Initially, appellants were not compelled to trial by deposition. Rather, they were afforded the opportunity of having the case referenced to a Master or trial by deposition. Under Rule 53(b) Fed.R.Civ.P. 28 U.S.C.A. reference to a Master:

> _ _ _ shall be the exception and not the rule. _ _ _ in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

---

1. Subsequently dropped.

Reference to the Master therefore was proper not only because the case involved an "accounting" and "difficult computation of damages", but also because of the "exceptional condition" that that one witness had arrived from Australia, one was en route, and a third was departing for the United States.

■ Appreciating that reference to a Master is a matter within the Trial Court's discretion, La Buy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), Harrington v. Sorelle, 313 F.2d 10 (10th Cir. 1963), Bradshaw v. Thompson, 454 F.2d 75 (6th Cir. 1972), cert. denied 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972), reviewable by the Court of Appeals, Wilver v. Fisher, 387 F.2d 66 (10th Cir. 1967), we hold that under the facts of this case the Trial Court did not err in determining that reference to a Master was proper. Accordingly, the Trial Court did not err in affording the parties the opportunity of opting between reference to a Master and trial by deposition.

■ Trial by deposition, under the facts of this case, and in view of the mutual consent of counsel, was proper. Furthermore, contrary to appellants' contentions, appellants waived their right to challenge this issue on appeal, and they further waived their right to contest the manner in which the depositions were taken. They clearly failed to comply with Rule 30(c) Fed.R.Civ.P. 28 U.S.C.A. which provides in part:

All objections made at time of the examination to the qualifications of the officer taking the deposition, or to the manner of taking it, or to the evidence presented, or to the conduct of any party, and any other objection to the proceedings, shall be noted by the officer upon the deposition. Evidence objected to shall be taken subject to the objections. In lieu of participating in the oral examination, parties may serve written questions in a sealed envelope on the party taking the deposition and he shall transmit them to the officer, who shall propound them to the witness and record the answers verbatim.

Nor did they comply with Rule 32(d)(3)(B) Fed.R.Civ.P. 28 U.S.C.A. which provides in part:

Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties, and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition.

In view of the unusual facts of this case, including the arrival of witnesses from Australia, counsel's consent to trial by videotaped depositions, coupled with an absence of any formal objection below, we hold that the trial by deposition did not give rise to error. We are puzzled by appellants' reply-brief argument, citing to Wingo v. Wedding, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974), in support of the proposition that they did not waive their right to a trial. *Wingo* is clearly distinguishable since as was noted, *supra,* appellants voluntarily opted to trial by deposition. Their voluntariness is evidenced by this recital in their Brief on Appeal:

Videotaping was selected from the Chief Judge's decree because of the value inherent (in defendants' view) of allowing the trial court to, observe the trial on film rather than read a magistrate's written record.

Appellants voluntarily chose trial by deposition as part of their trial tactics. Having so elected, they cannot now allege denial of their right to trial.

Appellants also argue that the failure of the Trial Court to consider all the evidence resulted in erroneous finding of fact. It is uncontested that the depositions of James Johnson, Clark Bower, Bernard Gillmann, and John Allwood, none of which were videotaped, had apparently not been opened by the Trial Court prior to the entry of judgment.

In support of this contention, appellants cite to nine (9) specific findings of the Trial Court, all of which are allegedly erroneous, purportedly the direct result of the Trial Court's failure to consider the four (4) aforementioned depositions.

Having reviewed the nine allegedly erroneous findings it is clear that appellants have engaged in legal mental gymnastics in an effort to discredit the findings of the Trial Court. No specific showing of prejudice was made. Error if present was harmless, and if present can not be said to be predicated upon the Court's failure to consider the aforementioned depositions. Though we cannot condone the Trial Court's apparent failure to consider the four depositions in question, the allegations of error advanced by appellants are without substance or persuasion.

 The handling of depositions is vested within the sound discretion of the court. Campbell v. Barnett, 351 F.2d 342 (10th Cir. 1965). Exclusion of evidence, though improper, need not always give rise to reversible error. Hardy Salt Company v. Southern Pacific Transportation Company, 501 F.2d 1156 (10th Cir. 1974). Furthermore, the exclusion of proffered evidence is not grounds for reversal unless it can be reasonably said that the evidence was competent and that its exclusion precluded a fair trial based on all competent evidence. Ottinger v. Siegfried, 349 F.2d 647 (10th Cir. 1965). It is not error to refuse to admit into evidence, or as here _ _ _ to refuse to consider depositions that do not add anything of probative value which has already been developed. Fenstermacher v. Philadelphia National Bank, 493 F.2d 333 (3rd Cir. 1974). We hold that upon considering the totality of the facts of this case, constituting substantial evidence in support of the Trial Court's holding, that reversible error did not occur from the Court's apparent failure to read the depositions verbatim. Cf. Salsman v. Witt, 466 F.2d 76 (10th Cir. 1972). Our independent review of the subject depositions supports this conclusion.

## II.

Appellants contend that there is no contract because of lack of consideration. In support thereof appellants theorize that: the contract fails because of mistake of the parties in creating future consideration; the contract is illusory because it fails to contemplate basic terms; and that moral consideration is insufficient to support the contract. These theories, advanced in defiance of logic and without support of cogent authority, do not comport with the facts of this case. The Trial Court found—and we concur—that a valid contract existed between the parties. In upholding the validity of the contract the Trial Court said:

The asserted failure of the consideration is two-pronged. First it is claimed CMP gave L & B nothing of value _ _ _. Second it is claimed that the royalty payments _ _ _ constitute illusory consideration _ _.

\* \* \* \* \* \*

_ _ _ If the "Rainline" system were "universally known" why did L & B desire to receive the plans and "know how" necessary to manufacture the irrigation units in question? CMP provided good consideration for the royalty agreement by sending plans, design features and "know how" to L & B. Further, Charles was an experienced business man, whose Company had engaged in international transactions before the CMP venture.

\* \* \* \* \* \*

As to the exchange rate argument, and the assertion that the contract is fatally defective for lack of specificity, reference to the course of conduct of the parties defeats this contention. The royalties paid by L & B, in American dollars at Los Angeles, and their acceptance by CMP evidence that the fatal defect urged by defendants is itself illusory. *No objection was raised by either party, from the date of the signing to termination by L & B in 1970, to the terms of payment of royalties. Indeed, the contract was performed to the satisfaction of both par-*

*ties until after the Smith takeover of L & B. Charles and Broinowski were not naive in the ways of international trade; they were experienced world-wide entrepeneurs.* While not lawyers they were nonetheless businessmen who knew the nature of the agreement into which they were entering, and had no difficulty manifesting their understanding of the royalty terms through their respective performance and acceptance thereof. (Emphasis supplied).

Appellants' argument that the contract lacked consideration is, as noted by the Trial Court, illusory. The speculative arguments of appellants give rise, at best, to the *possibility* that there was not a meeting of minds. Such a speculative conclusion, however, would be diametrically opposed to the facts which establish the formation of a contract, its execution and continued vitality, and the unilateral termination and repudiation thereof by appellant Smith.

 The appellate court cannot provide appellants a trial de novo. Hinde v. Hot Sulphur Springs, Colorado, 482 F.2d 829 (10th Cir. 1973); Marken v. Goodall, 478 F.2d 1052 (10th Cir. 1973); Hamilton v. Miller, 477 F.2d 908 (10th Cir. 1973); Dailey v. City of Lawton, Oklahoma, 425 F.2d 1037 (10th Cir. 1970). And in the absence of clear error, we will not reverse findings of a trial court on appeal. Beltronics, Inc. v. Eberline Instrument Corporation, 509 F.2d 1316 (10th Cir. 1974); Permian Corporation v. Armco Steel Corporation, 508 F.2d 68 (1974); Prisbrey v. Noble, 505 F.2d 170 (10th Cir. 1974); Quarles v. Fuqua Industries, Inc., 504 F.2d 1358 (10th Cir. 1974). Based on all of the facts in this record, we concur with the Trial Court's conclusion that a valid contract existed, supported by adequate consideration.

### III.

 Appellants contend that Australian law controls the subject contract and renders it void. At the outset we note this to be a rather unique argument since all the appellants are domestic, United States corporations; L & B is a California corporation, and the contract was entered into in California. Appellants argue that because the contract was not final until approved by the CMP Board on May 16, 1967 in Sydney, Australia, that Australian law controls. They argue, accordingly, that under Australian law the contract was void as violative of the currency regulations of the Reserve Bank of Australia. We disagree.

The Trial Court found that authentication of the contract under Australian law was, for the most part, ministerial:

As for the action of the CMP Board, it appears from the evidence that this was a prerequisite to filing and having revenue stamps affixed to completed contracts under Australian law. Broinowski characterized the Board's action as "authentication".

\* \* \* \* \* \*

For many years L & B had recognized the efficacy of the contractual relationship; further, in our view, it is for members of the CMP Board to question lack of Broinowski's authority to act. This they have not done.

The Trial Court further correctly found that the contract was effectuated in and therefore controlled by the laws of California. *This finding necessarily follows since it is undisputed that although previous drafts of the contract had provided that the contract be governed by Australian law, this proviso was removed and deleted upon L & B's objection.* Under these conditions, the Trial Court did not err in holding that a valid contract was consummated in California. See page 22, *supra,* re clear error. The intent of the parties, at the time of the execution of the contract, reflects their desire that the law of Australia *was not to govern.*

### IV.

We have carefully reviewed each of the other allegations of error raised by appellants and hold that they are singularly and collectively void of merit.

Affirmed.