**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 25 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff-Appellee,

v.

ANTHONY J. MARINO,

    Defendant-Appellant,

and

GREGORY C. JOHNSON; RICHARD AMES
HIGGINS; MOUSA INTERNATIONAL; AJM
GLOBAL; and CONSORTIO INTRANACIONAL,

    Defendants.

No. 00-4176
(D.C. No. 99-CV-258-G)
(D. Utah)

### ORDER AND JUDGMENT[*]

Before **KELLY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

The Securities and Exchange Commission sued Anthony J. Marino alleging

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Mr. Marino defrauded investors of approximately twenty-eight million dollars. The district court granted summary judgment for the Securities and Exchange Commission and permanently enjoined Mr. Marino from violating registration and anti-fraud securities laws. Mr. Marino now appeals the district court's ruling. He argues (1) the district court lacked jurisdiction because Mr. Marino was never properly served, and (2) the district court's entry of summary judgment violated Mr. Marino's right to due process. We have jurisdiction to review the district court's injunction pursuant to 28 U.S.C. § 1291(a)(1). "In reviewing the injunction, we may also address the summary judgment order that served as the district court's principal legal basis for granting the injunction because the district court's ruling on summary judgment was inextricably intertwined with [the injunction]." *Law v. National Collegiate Athletic Ass'n*, 134 F.3d 1010, 1015 (10th Cir.), *cert. denied*, 525 U.S. 822 (1998). After careful consideration, we affirm.

## BACKGROUND

On April 20, 1999, the Securities and Exchange Commission filed a civil suit alleging Mr. Marino engaged in "prime bank" securities fraud. "Prime bank" fraud schemes involve appropriating the reputation of reputable banks to solicit investment in sham "trading programs." Typically, false promises of substantial

profit induce investors into these frauds.

The Securities and Exchange Commission served Mr. Marino by delivering a copy of the summons and complaint to Mr. Marino's adult daughter at Mr. Marino's Las Vegas home. Mr. Marino's wife and daughter lived in the Las Vegas home. At that time, Mr. Marino was in Costa Rica, where he also maintained an apartment. After she received the service documents, Mr. Marino's daughter telephoned him. At his request, she immediately express mailed the documents to Mr. Marino in Costa Rica. Mr. Marino admits he received the service documents a few days later.

On the day the complaint was filed, the district court entered a temporary restraining order freezing Mr. Marino's assets.[1] This order also required Mr. Marino to provide an accounting of his assets and liabilities and repatriate his funds held overseas. Although Mr. Marino had contacted counsel, neither Mr. Marino nor the attorney appeared at an April 28, 1999 preliminary injunction hearing. The district court entered a preliminary injunction continuing the asset freeze and other relief granted under the temporary restraining order.

---

[1] Mr. Marino does not dispute he received the temporary restraining order with the summons and complaint.

After the district court entered the preliminary injunction, Mr. Marino telephoned the law firm of Suitter Axland to request legal representation. Even though Mr. Marino knew of the court orders freezing his assets, he subsequently transfered nearly $100,000 to a Suitter Axland trust account to be used for his defense. Attorneys from Suitter Axland then petitioned the district court to lift the asset freeze on the money in the trust account so they could represent Mr. Marino. In a well-reasoned order, the district court denied the petition. The district court also ordered Suitter Axland to remit the trust account money to the district court.

At some point during the summer of 1999, Costa Rican authorities arrested and incarcerated Mr. Marino for alleged violations of Costa Rican securities laws. Max D. Wheeler, with the firm of Snow, Christensen & Martineau, contacted the district court on August 3, 1999. Mr. Wheeler explained a family friend was willing to supply $50,000 for Mr. Marino's defense. However, Mr. Wheeler would only enter an appearance if the district court agreed these new funds were not subject to the asset freeze. After an investigation, the Securities and Exchange Commission agreed to the fee arrangement in a letter dated October 20, 1999.

On February 9, 2000, counsel for the Securities and Exchange Commission deposed Mr. Marino in Costa Rica. Although Mr. Marino's local counsel chose not to attend, two Costa Rican attorneys represented Mr. Marino at the deposition. During the deposition Mr. Marino admitted to participating in "trading programs," which he claimed produced ten percent returns per week. Mr. Marino refused, however, to identify his partners or the accounts still containing investors' funds citing "a nondivulge agreement" and explaining his cooperation would "not [be] good for [his] well-being." Mr. Marino admitted he was still in possession of forty to fifty million dollars of investors' money. When asked where the money was located, Mr Marino refused to answer, explaining, "[y]ou guys would freeze it." Based on this deposition, along with other investigative materials, the Securities and Exchange Commission moved for summary judgment. The district court granted the motion on October 6, 2000.

## DISCUSSION

### I.

Mr. Marino argues the Securities and Exchange Commission's "purported service upon Mr. Marino was defective as a matter of law." Specifically, Mr. Marino argues service was defective because "[a]t no time did the [Securities and Exchange Commission] make any effort whatsoever to serve Mr. Marino in Costa

Rica." The determination of a defendant's usual place of abode for purposes of service of process is a mixed question of law and fact. *Campbell v. Bartlett*, 975 F.2d 1569, 1574 (10th Cir. 1992). Because this case involves the application of undisputed facts to legal rules we apply *de novo* review. *Id.* at 1574 n.10.

Service of process may be completed by leaving a copy of the summons and complaint "at the individuals's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein." Fed. R. Civ. P. 4(e)(2). We have defined a person's usual place of abode as the place where he or she is "'actually living, except for temporary absences, at the time service is made.'" *Rosa v. Cantrell*, 705 F.2d 1208, 1214 (10th Cir. 1982) (quoting Federal Procedure Lawyer's Edition § 65:70 (1981)), *cert. denied*, 464 U.S. 821 (1983).

> "Service may be made on a traveling defendant by leaving papers at a place he has recognized as his legal residence, so long as he receives actual notice, even though his vocation takes him to other places on a regular basis and he returns to the place where process was delivered when he has the opportunity."

*Id.* (quoting Federal Procedure Lawyer's Edition § 65:71). Moreover, a defendant's extended travels do not change his usual place of abode "'if he did not intend to change his residence, *as evidenced by his leaving his family behind*.'" *Id.* at 1215 (quoting Annotation, Allen E. Korpela, Construction of phrase "usual place of abode," or similar terms referring to abode, residence, or

domicil, as used in statutes relating to service of process, 32 A.L.R.3d 112, 140-41 (1970).

The record on appeal shows Mr. Marino's Las Vegas home was his usual place of abode. Even though Mr. Marino's vocation took him on extended trips to Costa Rica, he maintained his home and family in Las Vegas. Mr. Marino would return to his family when he had the opportunity. In his words, "I didn't leave [Las Vegas] – I still have my house there, my family is there, I didn't leave. I would leave and go back and forth. I didn't physically take off."[2] Moreover, Mr.

---

[2] Mr. Marino contends the Federal Rules of Civil Procedure prevent consideration of this deposition because of irregularities in the deposition process. Mr. Marino argues Securities and Exchange Commission counsel ended his deposition too soon depriving him the opportunity to "ask any questions or clarify points." Mr. Marino also notes he was on blood pressure medication during the deposition. Moreover, Mr. Marino never reviewed and signed the deposition. The district court held Mr. Marino waived these objections by failing to move to suppress the deposition with reasonable promptness. "The handling of depositions is vested within the sound discretion of the [district] court." *Sims Consol., Ltd. v. Irrigation & Power Equip.*, 518 F.2d 413, 418 (10th Cir. 1975) (quotation marks and citation omitted).

> Errors and irregularities in the manner in which the testimony is transcribed or the deposition is prepared, signed, certified, sealed, indorsed, transmitted, filed, or otherwise dealt with by the officer under Rules 30 and 31 are waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained.

Fed. R. Civ. P. 32(d)(4). Mr. Marino first questioned these technical defects in response to the Securities and Exchange Commission's motion for summary judgment. At this point approximately five months had elapsed with "no effort whatsoever to challenge

Marino admits he received actual notice when his adult daughter express-mailed the documents to him in Costa Rica. Under these circumstances, service of process was valid.

## II.

Next, Mr. Marino contends the district court's entry of summary judgement violated his right to procedural due process. Specifically, Mr. Marino argues the order freezing his assets unfairly delayed his attempt to hire counsel. Moreover, Mr. Marino argues after hiring counsel he was not "able to consult with or assist counsel" because he was incarcerated in Costa Rica. "We review de novo the extent of constitutional rights." *United States v. Jones*, 160 F.3d 641, 645 (10th Cir. 1998).

"The procedural aspect of the Fifth Amendment Due Process Clause guarantees that government action may not deprive a person of life, liberty or

---

[the] deposition." Two Costa Rican attorneys represented Mr. Marino at his deposition. Also, Mr. Marino's local counsel had access to the deposition transcript. Despite these resources, Mr. Marino has never pointed to any factual errors in his deposed statements. Moreover, Mr. Marino has not identified his blood pressure medicine or provided any evidence the medicine would affect his ability to respond to questions. Under these circumstances, we cannot say the district court abused its discretion in holding Mr. Marino waived his objections.

property unless the government affords a fair procedure to contest the deprivation." *Id*. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Accordingly, "a defendant must be given a reasonable opportunity to employ and consult with counsel." *Chandler v. Fretag*, 348 U.S. 3, 10 (1954). However, the Fifth Amendment does not create a right to use assets properly seized pursuant to drug forfeiture laws to pay defense attorneys. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 633 (1989). Similarly, "a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." *Securities & Exch. Comm'n v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993).

The record on appeal shows Mr. Marino had a reasonable opportunity to hire and consult with counsel. Two Costa Rican attorneys represented him.[3] Although Mr. Marino was prevented from paying his attorneys with tainted assets,

---

[3] Mr. Marino argues "there is no evidence [his Costa Rican attorneys] ... were licensed to practice law in the United States or the State of Utah." However, Mr. Marino's Salt Lake City counsel, Mr. Wheeler, was licensed in Utah. Mr. Marino cites no authority indicating the due process clause requires every member of a defendant's international team of counsel must be licensed to practice in the venue jurisdiction.

he nevertheless also retained local defense counsel. Mr. Wheeler, a Salt Lake City attorney, expressed his intention to represent Mr. Marino on August 3, 1999. On October 20, 1999, a Securities and Exchange Commission investigation cleared $50,000 provided by a family friend to pay for Mr. Marino's defense. This left almost an entire year before entry of summary judgment for Mr. Marino to submit any accounting, affidavit, or deposition that would establish an issue of fact requiring a trial. Although Mr. Marino's records were seized by federal authorities, Mr. Marino does not dispute the records were available for review in preparing his defense. At times, Mr. Wheeler was able to consult with Mr. Marino via mobile phone in his Costa Rican prison. Mr. Marino's Costa Rican attorneys were able to visit Mr. Marino. Mr. Wheeler could relay messages to and from Mr. Marino through his Costa Rican counsel. Mr. Wheeler also had the option of traveling to Costa Rica to meet with Mr. Marino. However, when Securities and Exchange Commission attorneys traveled to Costa Rica to take Mr. Marino's deposition, Mr. Wheeler chose not to attend.[4] It was the fact of Mr.

---

[4] Mr. Marino also argues he "never attended any witness depositions or declarations upon which the summary judgment was based." He asserts this deprived him of "the opportunity to cross-examine any of these witnesses or follow up on the declarations." However, the only deposition relied upon by the district court was Mr. Marino's own deposition, where he was represented by two Costa Rican attorneys. The district court did consider the declaration of Robert D. Mulford, Vice President and General Counsel to the Federal Reserve Bank of San Francisco. We have held such statements taken under oath by the Securities and Exchange Commission "are equivalent to affidavits in terms of the quality of the evidence involved." *Securities E Exch.*

Marino's fraudulent activities, rather than the asset freeze or his incarceration, that encumbered his case. We are satisfied Mr. Marino had a meaningful defense in accord with Constitutional demands of due process.

For these reasons we **AFFIRM** the district court's judgment.

> **Entered by the Court:**
>
> **WADE BRORBY**
> United States Circuit Judge

---

*Comm'n v. American Commodity Exch. Inc.*, 546 F.2d 1361, 1369 (10th Cir. 1976). Mr. Marino was free to submit affidavits contesting this witness statement. Mr. Marino's counsel was also at liberty to depose Vice President Mulford or other witnesses who might establish an issue of fact. We are satisfied the district court's consideration of Vice President Mulford's declaration for purposes of summary judgment did not violate Mr. Marino's due process rights.