SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,

v.

AMERICAN COMMODITY EXCHANGE, INC., et al., Defendants,

**Howard D. Williams, Defendant-Appellant.**

**No. 76–1064.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 15, 1976.

Decided Dec. 13, 1976.

Paul Gonson, Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (Harvey L. Pitt, Gen. Counsel, James H. Schropp, Sp. Counsel, and John M. Mahoney, Atty., Securities and Exchange Commission, Washington, D. C., on the brief), for plaintiff-appellee.

Cleeta John Rogers, Oklahoma City, Okl., for defendant-appellant.

Howard Schneider, Gen. Counsel, Richard E. Nathan, Deputy Gen. Counsel, and Joan L. Loizeaux, Atty., Commodity Futures Trading Commission, Washington, D. C., amicus curiae.

Before SETH, McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

Defendant-appellant Williams seeks reversal of a judgment of the United States District Court for the Western District of Oklahoma granting a permanent injunction enjoining him from violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b) promulgated thereunder.

There were a total of 36 defendants named in the complaint. However, Williams is the only appellant. Twenty of the defendants consented to the entry against them of final judgments. They neither admitted nor denied the allegations of the complaint. Permanent injunctions by default were entered against seven other defendants and there was a dismissal without prejudice as to two defendants who were not served. Final judgments of permanent injunction permanently enjoining the defendants was entered against seven of the defendants and Williams who, as we have noted above, is the only appellant.

The SEC filed numerous affidavits, exhibits and transcripts of testimony in support of its motion for summary judgment. Appellant filed a motion to dismiss Counts II and III of the complaint, those which applied to him, and, in the alternative, moved for summary judgment. The only support for this motion was his own affidavit.

The essential theory of the complaint by the SEC against Williams and the others was that they were conducting a commodity options enterprise which was largely fictitious and designed solely to generate fees for Williams and his associates. Williams was a member of the Oklahoma State House of Representatives and had worked in conjunction with William G. Fisher, Administrator of the Oklahoma Securities Commission, to enact the measure. Williams obtained the passage of an amendment to a pending bill before the Oklahoma House of Representatives, the purpose of which was to regulate certain sales schemes. This amendment undertook to define a commodity option contract as a security subject to registration with the Oklahoma Securities Commission. It provided that such contracts were exempt from registration if purchased or sold on the floor of a bona fide exchange or board of trade by a broker-dealer or agent registered with the Oklahoma Securities Commission.

On March 15, 1973, this bill together with the Williams Amendment was passed. Thereafter, on May 17, 1973, Williams with three others organized the American Commodity Exchange, Inc. This exchange was intended to provide a marketplace facility for the buying, selling and trading of commodity option contracts. Williams then organized the Commodity Clearing House, Inc., which was designed as a clearing house for commodity option transactions which took place on the American Commodity Exchange. Following the organization of these two institutions, Fisher refused to promulgate rules defining bona fide exchange or board of trade, as those terms were used in the House Bill. He also refus-

ed to approve the formation of any bona fide exchange other than the American Commodity Exchange nor would he permit broker-dealer firms which were registered with the Oklahoma Securities Commission to join any other bona fide exchange. In addition, Fisher pressured the broker-dealers to become members of the American Commodity Exchange by issuing, in his official capacity, letters which stated that all commodity option contracts sold in Oklahoma were required to be transacted on domestic exchanges organized in conformity with the laws of the state of Oklahoma. The effect of this action was to make the American Commodity Exchange a monopoly.

Broker-dealer firms which became members of the American Commodity Exchange and Commodity Clearing House were required to pay a five per cent fee on each transaction negotiated on the exchange. This fee was passed on by the member firms to their commodity option customers.

The legislative measure exempted from registration only those commodity option contracts purchased or sold on the floor of a bona fide exchange or board of trade, and American Commodity Exchange literature stated that commodity option transactions would be effected on the floor of the exchange. The truth was, however, that the American Commodity Exchange did not in fact provide a marketplace for the agents of commodity option contracts. And the contracts were never negotiated on the floor of the exchange. Also, the Commodity Clearing House which purportedly acted as a clearing house for commodity option transactions merely received notification by telephone of transactions which had been brought about by broker-dealers and prepared reports of these transactions. In order to get fees from broker-dealer firms, Williams and others put the pressure on the firms by threatening that if they did not pay the fees they would be reported to Fisher, who could suspend their operations. They also told the broker-dealers that Fisher would recognize only the American Commodity Exchange since it was the only one

designated by the Oklahoma Securities Commission to regulate commodity option trading in Oklahoma.

The so-called commodity option contracts were not genuine. The issuers failed to implement the purported option contracts by purchasing either the underlying commodity futures contracts or the actual commodities. The investor was led to believe that he had purchased an option to buy or sell commodity futures within a specified period of time at a set price and that the price included the price charged by the issuer of the option plus the commission paid to the broker. Since, however, no actual contracts nor commodities were purchased, the customer was at the mercy of the broker-dealer and so the fact that the option was eventually exercised by a customer was meaningless. The success of the enterprise from the standpoint of the customer or buyer depended on the broker-dealer's general financial success.

The evidence in support of the summary judgment motion, consisting for the most part of ex parte depositions taken by the SEC as part of its pre-filing investigation, showed that as purported options were exercised at a profit, the issuers frequently defaulted on the payment of money owed to the successful investors. At other times the broker-dealer firms paid their customers the amounts owed by the issuers with premiums received from new investors for the purpose of other purported commodity option contracts. In some instances the broker-dealers credited profits to the accounts of their customers who had successfully exercised their options, but induced the customers to reinvest the "funds" in new purported option contracts.

For a period of about a year, from May 1973 until June 1974, according to the SEC evidence, the enterprise received at least $66,000 in fees for services. The so-called services consisted mostly of preparing reports of the commodity option transactions which had been brought about by the member broker-dealer firms with the customers. A large portion of the fees were for the most part diverted for the personal use and

benefit of Williams through the Fourth Dimension Investment Company and Earl E. Williams.

The SEC also offered evidence concerning a particular broker-dealer called Preferred Commodity Options Corporation which ran into financial difficulties and as a result agreed to transfer on March 15, 1974, over $150,000 in customer funds which had been escrowed to pay for option contracts. The allegation and proof was that Williams used these funds to purchase U. S. treasury bills totalling $150,000, which treasury bills were later cashed in Washington, D. C. and cashier's checks were obtained for them.

The defendant-appellant Williams has not denied most of the extensive allegations contained in the SEC complaints which have been summarized above. As noted, he filed an affidavit in which he set forth that he had never sold or attempted to sell any commodity option contracts to the public personally and that he did not hire or direct anyone at any time to sell commodity option contracts. He further said that he had not obtained a sales staff for these commodity option contracts and he did not take part in the organization of Preferred Commodity Options Corporation. There is a dispute on this because the SEC has claimed that he brought about the formation of Preferred Commodity Options Corporation. There is also an issue as to whether the $150,000 taken from Preferred Commodity Options Corporation was money belonging to the public. Williams claims it was not public money. Since, however, this transaction is not essential to the issuance of the injunctive relief, it is not the kind of fact issue which impedes grant of summary judgment.

Appellant does not deny that he created the American Commodity Exchange and the Commodity Clearing House, Inc., which companies provided the framework for the scheme, nor is there denial of its relationship to the State Securities Commission. The collection of the transaction fees is not challenged. Since, in addition to the above, there is undisputed evidence as to the collection of fees in connection with the sale of securities from broker-dealers for which neither appellant nor his associates performed any legitimate function, the case plainly fits within the definitions contained in Section 17 of the Securities Act of 1934, Section 10(b) and Rule 10b–5 of the Securities and Exchange Act of 1934.

The contentions advanced by the defendant-appellant Williams are:

First, that there was a failure of jurisdiction on the part of the SEC to proceed with the lawsuit for the reason that creation of the Commodity Futures Trading Commission excluded the Securities and Exchange Commission from any jurisdiction which it might have had.

Second, that the district court erroneously determined that the commodity futures options were securities under the laws of the United States.

Third, that the court erred in receiving at the hearing a great amount of hearsay evidence which had been adduced at investigation hearings conducted by the SEC.

Fourth, that the district court erred in granting summary judgment and denying the appellant's motion for summary judgment. One of the arguments under this heading is that summary judgment was improper because there were genuine issues of fact to be tried.

I

## WHETHER THERE WERE ISSUES OF FACT TO BE TRIED WHICH PRECLUDED THE GRANTING OF SUMMARY JUDGMENT

■ We hold that the trial court's use of summary judgment in disposing of the case was proper. Each of the parties filed motions for summary judgment. Defendant-appellant filed his and supported it with his own affidavit. The fact that there were joint motions does not result in any waiver of judicial determination of whether a material issue of fact exists on either side of the case. *See Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 245 (3rd Cir. 1968). This does not mean, however, that the making of

cross-motions is without significance, for it is. This court's decision in *H. B. Zachry Co. v. O'Brien,* 378 F.2d 423, 425 (10th Cir. 1967), held that the filing of cross-motions under Rule 56, F.R.Civ.P. raises the inference that there is no evidence other than the pleadings and supporting instruments to be considered, and so the trial court need only examine those materials in ascertaining whether an issue of material fact exists.

■ In the case at bar the defendant-appellant has not challenged any of the major premises which are presented in the SEC's charges. Thus, he does not contest the evidence tendered in support of the SEC's motion for summary judgment attempting to establish the existence of a fraudulent scheme such as the creation of laws making possible the perpetration of a scheme, the control of the market so as to give the ACE a monopoly on the commodity transactions and the control of the fees which are paid. Some of the elements disputed in the appellant's affidavit demonstrate this. He emphasizes that he never sold or attempted to sell any commodity option contracts to the public. Since actual sales were not essential and were not charged, this was immaterial. Similarly, he stressed that he had not hired anyone or directed anyone to sell such options and he did not obtain any sales staff for Preferred Commodity Options Corporation to promote sales or offers and that he did not take part in the organization of that company. He did deny that he had participated in the creation of Preferred Commodity Options Corporation, which company terminated its activity. It will be recalled that this is the instance in which the $150,-000 received from the Preferred Commodity Options Corporation by CCH was converted into government securities and was placed out of reach of the authorities.

As we view it, the Preferred Commodity Options Corporation transaction was not essential to proof of the existence and operation of the general scheme. This simply had a tendency to support the charge that it was all fraudulent. But there was no denial that the ACE and the CCH were both organized by appellant, and there is no de-

nial that the ACE and the CCH were used not for any good faith purpose but rather to provide the appearance of validity.

■ From the meager showing of appellant in his affidavit, the presence of a triable issue of fact capable of effecting the ultimate conclusion does not emerge. The picture which dominates the scene to the exclusion of appellant's offering is that of a fraudulent scheme symbolized by the option contract.

## II.

On the question whether the option in question is a security within the definition provided in the Securities Acts here invoked, the definition contained in the Act of 1933, 15 U.S.C. Section 77b(1) (Section 2(1) of the Act) is broad. It states that:

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

■ The district court held that the interests here employed constituted investment contracts and thereby were included in the definition contained in Section 2(1), *supra.* The fact that these option contracts were not what they purported to be in that there were not underlying commodity future contracts or actual commodities does not detract from their being in law a security. The term "securities contract" or other type of security set forth in the Act is to be construed in the light of economic realities. *See Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), and *United Housing Foundation, Inc. v. For-*

*man,* 421 U.S. 837, 848, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). The realities here, according to the SEC, are that even though Williams and his confederates acted so as to avoid the appearance of a security, their activities nevertheless had the character of transactions and thereby satisfied the statutory definition. The true relationship between the parties did not involve the transfer of any property interest. But it did subject the investor to risk over which he had no control. Therefore, when the outer structure of the arrangement is pierced, it is clear that this was indeed a security as the Act defines that term.

### III.

WHETHER THE DISTRICT COURT LACKS JURISDICTION TO ENTERTAIN THIS ACTION BY REASON OF CONFLICT OF THE SECURITIES ACTS WITH THE COMMODITY FUTURES TRADING COMMISSION ACT.

■ The jurisdiction question posed is a hard one: the problem arises from the fact that the acts and doings giving rise to the action occurred prior to the enactment of the Commodity Futures Trading Commission Act. At that time the Securities and Exchange Commission had jurisdiction since the indicia of the transaction, the so-called options, were securities. These acts uniformly took place prior to the effective date of the Commodity Futures Commission Amendment. However, the present action was not filed and, of course, the decree was not entered until sometime after the effective date of the mentioned Amendment. The Commodity Futures Commission Amendment provides on its face that its jurisdiction over commodity transactions, including fraudulent schemes such as that at bar, is exclusive.[1] If, however, we hold that the acts here considered are excluded so as to prevent SEC jurisdiction after the effective date of the Commodity Futures Commission Amendment, then we have a no man's land. The Commodity Commission would arguably be precluded from taking hold of violations which antedated its effective date, and if the SEC is powerless during this same period because of this enactment, it means that no sanctions would flow from conduct under either Act during the crucial periods such as those involved in this case.

The sensible approach to this would be to hold that Congress intended for the SEC to finish up its work before the exclusive provision of the Commodity Act became absolutely effective. Thus, the exclusive provision should apply only to new business, that is conduct which occurs after the effective date of the Act. Otherwise, this brand new agency would have to start with a backlog that arose during the SEC tenure. So we must inquire whether Congress in adopting the present Amendment gave any indication as to how it wished to solve this possible dilemma.

---

1. Section 201 of the Commodity Futures Trading Commission Amendment, 7 U.S.C. Section 2, shows this exclusivity:

    \*    \*    \*    \*    \*    \*

[T]he Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 217 of the Commodity Futures Trading Commission Act of 1974: *And provided further,* That, except as hereinabove provided, nothing contained in this section shall (i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

. . . .

We read this to mean that so long as the exclusive jurisdiction of the Commodity Commission is fully recognized, the jurisdiction of the Securities and Exchange Commission which does not impair or undermine the authority of the Commodity Commission within its field is entirely proper.

The references are found in the Conference Report, No. 93–1383, 3 U.S.Code Cong. and Admin.News, 93rd Cong., 2d Sess., 1974, p. 5894. It gave this expression:

> The *House* bill provides for exclusive jurisdiction of the Commission over all futures transactions. However, it is provided that such exclusive jurisdiction would not supersede or limit the jurisdiction of the Securities and Exchange Commission or other regulatory authorities.

*Id.* at p. 5897.

If we were to stop with the second sentence the conclusion would be that Congress intended for the Securities and Exchange Commission to retain its jurisdiction over commodity transactions indefinitely so long as there was also a security. The House version was rejected by the Senate.

The next paragraph of the Conference Report clarifies this. It reads as follows:

> The *Senate* amendment retains the provision of the *House* bill but adds three clarifying amendments. The clarifying amendments make clear that (a) the Commission's jurisdiction over futures contract markets or other exchanges is exclusive and includes the regulation of commodity accounts, commodity trading agreements, and commodity options; (b) the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies; and (c) Federal and State courts retain their respective jurisdictions.

*Id.*

The Conference Report then explains that the Senate Amendment merely clarifies the House Bill by stressing the exclusive jurisdiction of the Commodity Futures Trading Commission within its sphere of activity so that on a permanent basis there would not be overlapping. The House version would have allowed limited joint jurisdiction. This is confirmed by the Staff Report of the Senate Committee on Agriculture and Forestry, 93rd Cong., 2d Sess., The Commodity Futures Trading Commission Act of 1974, 6 (Comm.Print 1974), which says that "The Senate refined this language (referring to the House provision which is referred to above) in an attempt to avoid unnecessary overlapping and duplicative regulation." This explanation shows that the Senate Bill which was adopted was not intended to exclude interim jurisdiction such as that with which we are now dealing.

On the floor of the Senate and House, respectively, Senator Talmadge and Representative Poage said that:

> [A]ll pending proceedings, including ongoing investigations as well as court proceedings, should continue unabated by any provision of the act. This is also necessary to prevent the creation of any regulatory gaps . . . . During the course of our deliberations, we learned, for example, that the SEC has a number of such matters currently under investigation. We would expect that those investigations will continue and any proceedings resulting therefrom will not be affected by the passage of this act.

120 Cong.Rec.S.18866 (daily ed., Oct. 10, 1974); 120 Cong.Rec.H.10248 (daily ed., Oct. 9, 1974).

This is the best evidence to be found in support of retention by the SEC of interim jurisdiction in those instances where they have a pending investigation. Thus, it shows recognition by both the Senate and House floor leaders that the intention was not to do away with the interim jurisdiction. *See Securities and Exchange Commission v. Norton,* CCH Fed.Sec.L.Rep. Par. 95,709 (N.D.Ill.1976). This decision was to the effect that the House Report intended to leave undisturbed any matters under investigation by the SEC at the effective date of the Act in April 1975. The court said that since the case before it was being investigated at that time the Commission's standing to maintain the suit continued. However, another case from the Northern District of Illinois adopts the opposite viewpoint. *See Securities and Exchange Commission v. Univest, Inc.,* 405 F.Supp. 1057, 410 F.Supp. 1029 (N.D.Ill.1976). Notwithstanding that the court there had before it most of the investigative evidences which we have mentioned, it flatly adopted the

absolute viewpoint that since the Commodity Futures Trading Commission Act on its face superseded the jurisdiction of other agencies that all interim jurisdiction of the SEC was precluded. The *Univest* case is pending before the Seventh Circuit (No. 76–1734).

█ Based on the history and the strong reasons of policy and of legislative logic, it is to be concluded that the Commission retained jurisdiction to bring the suit and that the trial court had jurisdiction to entertain the case and to grant the relief prayed for. This view is in harmony with the legislative history. It carries out the Congressional intent to avoid overlapping, but it does not create a void period during which neither Commission can act.

### IV.

### THE USE OF INVESTIGATIVE STATEMENTS BY THE SEC

The record here in support of SEC's motion for summary judgment includes exhibits, an audit by an SEC accountant and, finally, investigative statements. Appellant does not argue that consideration of this mass of evidence by the court on summary judgment was wrong. He simply says that it was error to permit the record to be encumbered with a great amount of hearsay evidence, adduced by way of an affidavit of an employee of the SEC, and, secondly, he makes the statement that the court is not obliged to consider the transcripts of investigative testimony. He goes on "to suggest" that the better law is that such testimony not be allowed.

As to the first point, we have examined the affidavit of the SEC investigator and we see nothing untrustworthy in it. He does make some statements as to matters which he found, but it appears from a cursory examination that all of this is documented by exhibits which appear to be records of the enterprise.

█ As to the SEC investigative statements, we see no difference between these affidavits. The latter are expressly authorized for use in connection with summary judgment by Rule 56 F.R.Civ.P. Congress has chosen to authorize the SEC to subpoena witnesses and to take question and answer statements under oath. These are equivalent to affidavits in terms of the quality of the evidence involved. The important thing is that from a consideration of the vast positive evidence tendered by SEC and unchallenged by the defendant, no issue of fact surfaces.

█ The competency of evidence tendered in support of a motion for summary judgment is not to be judged on the same basis as evidence which is offered at trial. To be sure, it ought to be evidence that would be admissible if offered at trial in proper form.

There may be some items here that could not stand up under the above test. However, they are not called to our attention and so we have to conclude that the proceedings before the district court here were proper.

The judgment of the district court is affirmed.