SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,

v.

COMMODITY OPTIONS INTERNATIONAL, INC., a California Corporation, Double Option Systems, Inc., a California Corporation, Josef Rotter, Individually and as president and director of Commodity Options International, Inc., and Double Option Systems, Inc., C. R. Richmond & Co., a California Corporation, and Curtis R. Richmond, Individually and as president and director of C. R. Richmond & Co., Defendants-Appellants.

No. 75–2385.

United States Court of Appeals, Ninth Circuit.

May 10, 1977.

Darrell L. Johnson, Lindholm & Johnson, Los Angeles, Cal., for defendants-appellants.

David Ferber, Frederic T. Spindel, Howard B. Scherer, Attys., Securities Exchange Commission, Washington, D. C., Charles R. Hartman, III, Los Angeles, Cal., argued for plaintiff-appellee.

Before MERRILL, ELY and CHOY, Circuit Judges.

MERRILL, Circuit Judge:

The sole question presented by this appeal is whether naked double options to buy and sell commodity futures contracts are investment contracts and thus are "securities" as defined by § 2(1) of the Securities

Act of 1933, 15 U.S.C. § 77b(1).[1] Contending that they are securities, the Securities and Exchange Commission (SEC) sought an injunction to prevent appellants from offering and selling such options until a registration statement as to them was in effect as required by the Act.[2] The injunction was granted by the district court and this appeal followed. We affirm.

Commodity Options International, Inc. (COI), and Double Option Systems, Inc. (DOS), are California corporations, operated substantially as a single entity, with their principal place of business in Beverly Hills, California. Josef Rotter is president of COI and controlling shareholder of both COI and DOS. Both corporations engage in the business of issuing double options to buy or sell commodity futures contracts. Appellant C. R. Richmond & Co. (CRR), is a California corporation engaged in securities transactions as broker-dealer. It is charged in this action with acting as agent for COI and DOS in the sale of double options. Appellant Curtis R. Richmond is its president and sole stockholder.[3] From July, 1972, until March, 1973, CRR offered and sold about 125 naked double options to about 100 customers by use of means and instruments of transportation and communications in interstate commerce and of the mails. Appellants did not write the options themselves. COI and DOS wrote the options and paid CRR commissions on their sales. Appellants transmitted all funds received from their customers for the purchase of the options to COI and DOS, and when customers "exercised" or liquidated

their options the appellants transmitted funds from COI and DOS to the customers.

A closer examination of the particular options offered and sold by appellants first requires a general description of trading in commodities and commodity futures contracts:

" Commodity trading encompasses two areas of transactions. There is a current or spot market for virtually any type of commodity item for which there is sufficient interest and, therefore, trading volume. Secondly, there is a futures market that involves various commodities due to be grown, produced or otherwise made available at some later point in time. It is this latter market which makes commodity trading unique since the time element factor together with frequent changes in supply-demand forces due to natural, market, legal, etc. factors can produce substantial price-level changes. Potential price-level changes combined with 'margin trading' practices can create significant profit/loss situations with relatively modest capital commitments. (Margin trading is the practice of putting up only a fraction of the purchase price on a commodity contract—usually 5–10 percent. A small increase in price relative to the actual funds committed can produce a large profit, percentagewise, and, of course, a price decline has the opposite effect. This situation is said to involve 'leverage'). Regular or 'long' transactions involve the purchase of commodities with the anticipation of a subsequent price rise and their ultimate profit

---

1. Section 77b(1):

   "The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

2. Section 201 of the Commodity Futures Trading Act of 1974 (CFTA), 7 U.S.C. § 2, gives the Commodity Futures Trading Commission "exclusive jurisdiction with respect to * * * [commodity options]." The complaint in this matter was filed April 6, 1973, before the effective date of the CFTA (180 days after October 23, 1974) and the authority of the SEC under these circumstances has not been questioned here. *See SEC v. Am. Commodity Exch., Inc.*, 546 F.2d 1361, 1367–69 (10th Cir. 1976).

3. The appeal is taken only by CRR and Richmond. Consent injunctions have been entered against COI, DOS and Rotter.

at the time of sale of the commodities. 'Short' transactions involve the initial sale of commodities to be delivered in the future with the deposit of margin (customer equity) and the promise of a future purchase of the same commodity in the same quantity due for delivery at the same time, etc. The anticipation here is that future price will decline and produce a profit to the speculator."[4]

The commodity futures market operates through futures contracts and dealing in these contracts has become the most active aspect of commodities exchanges. One article explains the reason in this fashion:

"Today, futures contracts are standardized contracts with terms being determined by the exchanges. Futures contracts thus became fully identical and interchangeable. This interchangeability allows a seller to 'offset' his obligation to deliver a commodity by an equal and opposite transaction. Similarly, a buyer could liquidate his obligation to accept a commodity by entering into a contract of sale of futures contracts of the equal amount. Standardization of contracts thus served to add two new dimensions to commodity futures trading. In addition to serving as an alternative to selling the actual goods on the 'spot' market, futures trading became a means of financial protection through the practice of 'hedging' as well as an important field of investment for speculators."

Jones & Cook, The Commodity Futures Trading Commission Act of 1974, 5 Mem.St. U.L.Rev. 457, 460 (1975).

One need not resort to actual purchase of a futures contract in order either to hedge one's position or to speculate. Options to purchase or to sell futures contracts are now extensively dealt in. By paying a premium the purchaser can obtain either a "call" option—one to *buy* a futures contract at a stated price (the "striking price," usually the market price at the time the option is purchased) at any time during the period covered by the option, or can obtain a "put" option—one to *sell* a futures contract at the striking price at any time during the option period. One writer explains the transaction as follows:

"The purchaser of a call theoretically makes his profit when the market for the underlying commodity futures rises. If this occurs, he exercises his option, purchasing the commodity futures contracts from the seller of the option at the striking price and reselling them in the open market; his profit is the difference between the striking price and his selling price, less the fee [premium] he paid for the option. In the case of a put, the option purchaser is betting that the market for commodity futures contracts which he holds will fall. If his hopes are realized, he [purchases contracts on the open market,] delivers the contracts to the option seller and receives the striking price; his profit derived from the option is the difference between the striking price and the market price at the time he exercises the option, less the option premium."

Long, The Naked Commodity Option Contract As a Security, 15 Wm. & Mary L.Rev. 211, 213 (1973).

It is also possible to buy both a put and call option on the same commodity at the same time for the same striking price. Such a purchase is called a "straddle" or double option.

These options are what may be called "conventional" options in which the optionor actually has the underlying commodity futures contract to which the option relates or the right to obtain such a contract. In recent years dealing in what have come to be called "naked" options has commenced. With reference to this Professor Long has written:

"Although ostensibly representing an option to buy or sell underlying commodity futures contracts, the naked option contract is in substance nothing more than a bet between the investor and his dealer that the price of a given commodity future will rise or fall during a particular

4. Report of state court receiver for COI and DOS.

time period. The label 'naked' is applied because dealers in such options do not maintain adequate inventories of ·the underlying futures and there generally is no intent that they will ever change hands. The device, therefore, is quite unlike conventional commodity option contracts, which normally do involve the actual exchange of the underlying commodity futures contracts upon exercise of an option."

*Id.* at 211–12. Further, he writes:

"[The conventional] option does serve· a valid economic purpose by permitting the actual user of the commodity to hedge against a fluctuation in the price' of the commodity and thereby shift his risk of loss to others. On the other hand, because naked option contracts generally are not settled by the actual exchange of underlying futures contracts and thus do not serve any hedging fuction, they are nothing more than a vehicle for speculative investment."

*Id.* at 226. *See also* Long, *Commodity Options—Revisited*, 25 Drake L.Rev. 75, 82–87 (1975).

It is the naked double option with which we are here concerned; it is the naked double option that COI and DOS were engaged in selling, with CRR acting as agent. The record contains much of the promotional material used in soliciting sales of these options. From this material it appears that the double options were handled as follows by COI and DOS:

They were issued for commodities (principally sugar) that are not subject to regulation under federal commodities exchange acts. They were written for eighteen months. If exercised before that date, a rebate on the premium was paid in addition to any profit realized. The usual sale contract contemplated that when a specified profit over the amount of the premium paid has been realized through the market having either advanced or declined to the necessary extent (30 percent profit was recommended as the objective), the seller (COI or DOS) would automatically redeem or buy back the option and reinvest the proceeds

(plus any rebate) in another double option for a futures contract on the same commodity at a new striking price with the same profit objective. A customer could not require actual delivery of a futures contract and none was ever delivered.

A promotional letter from CRR to its clients described the options as follows:

"The biggest problem in both the stock market and the commodities market is that of judgment—when to buy and when to sell. That risk is totally eliminated in the double option concept. You do not care which way sugar fluctuates, only that it fluctuates. If it goes down, you win. If it goes up, you win. * * * The unknown in this program is how many times will you make 30% a year. Seven out of the last ten years you would have made 30% at least three times a year. * * *

There are only two risks, as we see it, in this program. The first would be for sugar to go exactly sideways for 18 months, which is highly unlikely. As we stated before, sugar has fluctuated since World War II. The other risk is that the option writer does not hedge himself properly. This was our only concern when we first heard of the concept, but we have become convinced that the risk is quite small."

"Hedging" to COI and DOS is a somewhat different concept from that applicable in the case of the conventional option. What "hedging" meant to COI and DOS is explained in appellants' opening brief as follows:

"Presumably to avoid what would appear to result in inevitable trading losses if each double option were backed up by a long and a short futures contract, COI devised a method of trading in the commodities market, referred to as 'hedging.' The objective of the COI hedging program was simply to *invest the premiums provided by investors from the purchase of a double option in the commodities market to generate profits and be ready to pay investors who liquidated their dou-*

*ble options* \* \* \* *."* (emphasis added and citations to record omitted).

The question, as we stated at the outset, is whether the naked double option as sold by COI, DOS and CRR is an investment contract and thus a security under § 2(1) of the Securities Act of 1933, *supra* note 1.

For thirty years the controlling definition of investment contract has been that set forth in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946):

> "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party \* \* \* *."*

In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975), the Court, in discussing the definition of "security," stated:

> [The Howey definition] embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."

■ Commodity futures contracts are considered not to be securities per se. *See, e. g., Sinva v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359 (S.D.N.Y. 1966). They are investments to be sure. The investment, however, is not in an enterprise but is in the underlying commodity, and we may assume, arguendo, that a conventional option to buy or sell a futures contract takes on the character of the contract that is the subject of the option and is no more a security than is that underlying contract.[5]

■ With a naked option we have quite a different situation. Although denominated an option, the parties have not treated or regarded it as one. There is neither an underlying contract nor an underlying commodity that can be said to be the subject of investment. The commodity futures trappings are pure facade. The purchase of a naked double option[6] in reality is a transaction in which the buyer risks his capital to the extent of the premium;[7] that capital is

---

**5.** With reference to this question, Professor Long has written:

> "All too often the option promoters try to argue that since the basic commodity or futures contract is not a security, ipso facto the option contract itself cannot be a security either. Such a broad generalization is clearly not supportable. Each is a separate item whose 'securitiness' must be established or denied by reference to its own attributes. However, like most broad generalizations there is some grain of truth in the statement. It is true that if the basic commodity or futures contract itself is not a security, then the option contract does not become a security *automatically* by virtue of the fact that it is 'a warrant or right to subscribe to or purchase' a security. This of course does not mean that the option contract cannot become a security by virtue of satisfying some other portion of the definition."

Long, *Commodity Options—Revisited*, 25 Drake L.Rev. 75, 81–82 (1975).

**6.** In the case of the naked single option it can arguably be said that the buyer has made a wager, and a nice question may be presented as to whether such a wager can, under *Howey*, be regarded as investment in a common enterprise. This intriguing question we need not

reach. We confine ourselves to consideration of the naked double option.

Here not only are the commodity futures trappings of the transaction sham; the same would seem to apply to the gambling aspect as well. As we have noted, the buyer is assured that he is betting on practically a sure thing. There is, of course, the possibility that the market will not rise or fall to the extent necessary to produce such a profit as will cover the premium. In such a case the buyer will lose and the seller will win. However, as we have noted, the buyer is assured that never has the sugar market gone sidewise for the option period of eighteen months since the end of World War II. If there is a betting aspect to the naked double option, it is hardly of such dimensions as to warrant characterizing the investment as a wager.

**7.** *See* Hannan & Thomas, *The Importance of Economic Reality and Risk in Defining Federal Securities*, 25 Hastings L.J. 219, 242 (1974); *Great W. Bank & Trust v. Kotz*, 532 F.2d 1252, 1257 (9th Cir. 1976); *El Khadem v. Equity Securities Corp.*, 494 F.2d 1224, 1229 (9th Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

taken by the seller, pooled with that of other buyers[8] and put out to speculation with the expectation that the seller's expertise in speculation will produce a profit in which the buyer and seller will share, the buyer's share being fixed by reference to the manner in which the market in sugar behaves.[9]

This investment is not unlike that in *Los Angeles Trust Deed & Mortgage Exchange v. SEC*, 285 F.2d 162, 166–72 (9th Cir. 1960), *cert. denied*, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961). There, money was paid to the seller, ostensibly for the purchase of notes secured by trust deeds. An account was opened in the name of the purchaser and was, by the seller, invested and continually reinvested in notes and trust deeds, with the seller handling the collection of interest and principal and servicing the accounts. The seller contended that notes and trust deeds were the subject of the investment and constituted interests in real property rather than securities. We held that a common enterprise under *Howey* existed, since the economic welfare of the purchaser was inextricably interwoven with the seller's ability to operate its enterprise profitably. We held that it was in that common enterprise that the purchaser had invested and that the sale transaction amounted to an investment contract.

We conclude that the naked double option, as handled by COI and DOS, was an interest that fits perfectly into the *Howey* definition and the *United Housing* touchstone: an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial efforts of COI and DOS.[10] It was, then, an investment contract and a security under § 2(1) of the Securities Act of 1933.[11]

Judgment affirmed.

ELY, Circuit Judge (concurring):

In the light of the controlling precedents of our court, cited in the opinion so carefully written by my Brother Merrill, I concur. I am inclined to believe, however, that were I freed of precedential compulsion, I would adopt the approach taken by our Brothers of the Seventh Circuit. *See, e. g., Glazer v. Nat'l Commodity Research and Statistical Services, Inc.*, 388 F.Supp. 1341 (N.D.Ill. 1974), *aff'd*, 547 F.2d 392 (7th Cir. 1976); *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972). If I am correct in my analysis of these cases, the "common enterprise" requirement of *Howey* could not be found under the facts of the case here under review.

---

**8.** Here, the common enterprise requirement is met, whether it be considered horizontal as the language of *Howey* suggests, 328 U.S. at 301, 66 S.Ct. 1100, or vertical as *Howey* has been interpreted, *Hector v. Wiens*, 533 F.2d 429, 433 (9th Cir. 1976).

**9.** The efforts of persons other than the option purchasers were the "undeniably significant ones." *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

**10.** Our decision is consistent with the conclusion of one court of appeals, *SEC v. Am. Commodity Exch., Inc.*, 546 F.2d 1361, 1366–67 (10th Cir. 1976), and to the extent that it is inconsistent with another court of appeals, *Glazer v. Nat'l Commodity Research and Statistical Service, Inc.*, 547 F.2d 392 (7th Cir. 1977), we respectfully disagree.

**11.** (*Page 10*) In light of our decision that the naked double options involved here are investment contracts, we need not consider whether they might also be securities under other portions of § 2(1). *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).